Good afternoon, I'm Marty Baskin for the Healthcare Association and would like for three minutes for about all of this. If I could just jump in real quick, if we could stop the clock. Mr. Baskin, we're having a really hard time hearing you. That was better, actually. Could you give us like a test, one, two, three, because it looks better now. All right, testing, testing, one, two, three. Okay. All right. Let's start the clock. Let's go. It's working. Okay. So what I was saying was, it would be good to have three minutes for rebuttal. Very well. And so we are, of course, challenging Assembly Bill 2455 on behalf of these Home Care Associations who are the appellants, which is now a part of the Health and Safety Code. And as amended, that law is, we believe, plainly preempted by the federal labor law for many reasons. But I want to start with just a couple, and I'm sure you'll have some questions. First, the state is clearly acting as a regulator. And I think the court, district court, and certainly the other side seems to have lost sight of that. It's using its regulatory power over the Home Care Aids Registry for the improper purpose. It's spelled out right on the face of the Act, which is quite rare. They're usually more subtle about these things. It says right there in the Act, this is intended to facilitate, assist, help union organizing of the private sector home care industry. This deliberately upsets the careful balance drawn by the National Labor Relations Board and by Congress. So this is not about whether it's good or bad. What if the statute just told the state to post licenses online, like lawyers bar numbers are available online? What if home care workers, the state just posted the information? Would that trigger a labor concern like you're raising here? Well, no, because it would be then a law of general application. I can't say it would have no concern, but the case law, and all of the cases they cite, frankly, are laws of general application, including bar numbers and the like. This doesn't fall anywhere close to that because it says right in there it has a specific purpose. And it also says you can't, no one else is entitled to this information in the statute. This is not disposed to anyone except the unions for the express purpose of organizing. But in what way, in what way would the public posting be any less harmful to you in the concerns you're raising about the likelihood of unionizing? Well, it could have harm, but it would be a law of general application. And the Supreme Court, you know, we're bound by what the Supreme Court has said, all of us. And since Metropolitan Life Insurance, they've said when there is a law of general application, that is a different analysis. And it's not clear that it would be, in the hypothetical you described, that it would be helping union organizing, it would be accomplishing a lot of other things. Now, I'm not saying that if they run out tomorrow and do it, we might not still challenge it. But it would be a lot harder argument for us to make simply because of the Supreme Court. Counsel, let me ask you this, that at least many of the evils that the law might raise seem to me go to the healthcare workers themselves, that the harm to your people is, you know, potentially secondary or tertiary, it depends on, you know, what the unions do, what the people do, they have votes and so on. Frankly, is there any reason that you didn't get workers into this suit? I'm sure out of the 120,000, there's some who would not like their information posted or would not like to have to, you know, stand up and ask for an exemption, for an opt out. So it seems to me that they would have a much stronger standing argument than you have. Well, two answers to that. The first is that there is a direct impact on the employers, because they are coerced and compelled to hire only employees who are registered. So from the get go, they are directly regulated. However, to answer your second question, where are the employees? Frankly, it's unfair to expect employees to, who are over an issue of privacy, to expect them to put themselves out there for possible retaliation and targeting. And it's not something that the association felt was the right thing to do. Who would retaliate against them? You're representing their employers. Well, the retaliation is from the union and from the state. And in particular, they'd be targeted for the kind of organizing, or at least there is the threat. That is the perception. Certainly, the employer's not retaliating against them. But counsel, couldn't you just do a John Doe or Jane Doe in that situation? Well, easier said than done to get people to come forward in a case like this. So it's just, they're not there. But we do not need them to be there, because there is a direct connection between the pressure that's put on the regulation that is put on the employers to start with. I think even the unions and the state would concede that if the state had passed a law that said, from now on, employers are going to be required to turn over their employee contact information, employers directly. Whenever the unions ask for it, I think the state would agree that that's the dots of the same thing. The employers have to hire these employees. The employees have to be registered. So they're under covered by the regulatory power of the state. And then they are required, no opt-out, they're required to turn over their personal contact information to the state. The only time the opt-out comes about is when the state makes this decision, now compelled by statute, whenever the union asks for it, to give the union this contact information. It all comes down to the employer regulation in the first place. And as the judge in this report found, the avowed purpose of the act is to increase organizing. Who does that affect adversely? It's the employers. Although in some instances, the argument is that it adversely affects the employees, too. But for purposes of this, it's the employers who are adversely affected. And there's really no question about that. And it's right there. That's clearly what the state wants. Well, when you say you're not adversely affected, the things that might happen that is a union organizing effort, that could happen and does happen regardless of their getting this particular information. So is it that it just makes it easier for them to organize? And therefore, perhaps they will win down the road? It is putting the state's thumb on the scale to give the unions an extra advantage because the state wants more people to be unionized. The trouble with that is we have a federal labor law that has said this is up to the National Labor Relations Board to determine what the ground rules are in a neutral way, even though that statute also encourages unionization. But it also encourages the right not to be unionized. It's left to the labor board. And that's where Garmin preemption comes in. And they have developed an interwoven set of complex regulations to govern this process. And they don't just govern the petition and election process. The NLRB controls every aspect of union support and union organizing before petition, during petition, after election. Just last week, they issued a new announcement. They're going to revisit the issue of employee handbooks having nothing to do with elections, but on whether they facilitate or discriminate against, interfere with employee rights under the act. So this notion, which the district court said that, well, this is something that is before petition, that doesn't change the NLRB has regulatory control over it. And if it does, that means and if you say that, then you're not under Garmin preemption. You're under machinist preemption, which means it's a zone left free of regulation by either the federal or state agency. And because this is a state agency regulating using their licensing power, it's really remarkably similar to the Golden State transit case, where they were just exercising their licensing authority over taxicabs and said, now, if you want that franchise to be renewed, you better settle this labor dispute. Here, they're using this power as a regulator to violate the principles of Golden State. But we also believe strongly that the NLRB does govern this, in which case, they're violating the Garmin preemption. They're definitely violating one or the other, because that was their intent was to, again, put their thumb on the scale, to shift the balance, to make it easier for unions to organize by giving them this information, which otherwise, they would not be entitled to coming from the employer. And we're getting close to my time, but I just would say that one of the answers or the questions they raised about that is, well, isn't the state just a third party? Or can't the unions get this directly from the employees on a voluntary basis? And yes, they can. But instead of doing that, they're going to get the state to do it. And the state is not just a third party who happens to have this information. The state has used their regulatory power to grab the information, to force the employees to turn it over for what was supposed to be a consumer purpose, and now has been twisted to become a labor relations objective. So I'm happy to take additional questions. And I also want to be careful of my time for rebuttal. Any questions for my colleagues? All right, seeing none, you've got a good chunk of rebuttal. That's always helpful. All right, Mr. Goldstein, you've got 10 minutes. Here we go. Sorry, Your Honor. Good afternoon, Your Honor. Seth Goldstein from the California Attorney General's Office on behalf of Applebee's, Rob Bonta, and Kimberly Johnson. The National Labor Relations Act does not preempt AB 2455 because nothing in the NLRA prohibits California from disclosing its own government data about licensees. These disclosures do not implicate Garmin preemption because they do not interfere with the authority of the National Labor Relations Board. And they do not implicate machinist preemption because access to government data is simply not a zone free from all regulations. And for preemption purposes, the relevant question is not the intent of the legislature in enacting state law, but rather whether the state law conflicts with the NLRA, which here it does not. I just wanted to briefly turn to standing because there were a number of questions about standing in Appellant's opening argument. Plaintiffs could have named, as the questions were provided to it, plaintiffs could have named some affected employees. They also failed to name any of their members who were actually affected. And under the Summers case, under the Associated General Contractors case, it says that plaintiffs challenging a state law need to actually name an affected individual, which they did not hear. So I think there's a couple of issues with plaintiffs standing. Is that true when all of their members are similarly situated? So in an environmental case where only some members hike in the area, you need to point to someone who does. But here they're saying the state did this to increase unionizing, and we're all in the same position. What is the purpose of identifying one member at that point? Well, Your Honor, I don't think we know that for sure. I think that some employers might, or the union might already know the names of the employees. So that could be a difference with respect to some employers. The other difference would be in some instances, remember, in this statute, there's actually an opt out. So any employee who does not want to share their information with the union can opt out. So if you had an employer in which all of their employees opted out of sharing this information, there's a simple option to do that under the statute. The union wouldn't have any of that information. So it's not a membership organization. So I mean, it's pretty unlikely that they don't have any member who is in this position, even if some member, all of their employees opted out or something, right? Like, almost all their members are in the same position anyway, wouldn't they be? Well, there are cases that say when all the members are in the same position, then you don't have to name an individual affected member. But we're saying that, you know, maybe most or maybe some are in the same position. But because there are these exceptions, I don't think it's all. If I could ask you about the preemption interaction with the NLR, A and NLRB, sort of how far does this go? If the state, for example, sent a letter to all of these people saying, we think you're unionizing would be a good idea. And that's why we are sending it so you will vote that way in the next union election. Would that potentially impinge on the NLRB's fair election rules? Your Honor, I think it would depend on the specifics of that law. But I think this law here doesn't impinge on the authority of the NLRB for several separate reasons. And first, the two regulations that plaintiffs point to, they only mandate that contact information must be provided by employers prior to labor elections. They hear, of course, the regulation. So here, of course, this is not about labor elections. This is simply in other situations. Moreover, the regulations themselves. When you say prior to, is there a date in the sense that anytime we think about union elections, we may be organizing one or two years in advance, that would still be prior to, wouldn't it? Your Honor, there are specifics in the regulations. They say two days prior to the... You're talking about the NLR regulations or the state's statute? The NLRB regulations. Okay, but so the state statute would be that you can release this information whenever, right? Yes, Your Honor. No time limit? No, Your Honor. Another couple of reasons why this is different and why this is not preempted in the Garmin. And that's because the AB 2455 addresses only the government's disclosure of own information about licensees. It does not regulate the employer-employee relationship at all. And the contact information is provided by the state, not by the employers. Employers actually don't have to do anything at all with respect to AB 2455. And finally, the regulations themselves allow employers and unions to share contact information at other times. And that's a fact that plaintiffs conceded in the district court. So I think our broader point is that these two NLRB regulations do not imply broader rules about employee contact information in all circumstances. Turning briefly to machinists, which was plaintiff's second argument, under machinist states are prohibited from regulating an area that Congress left for the free play of economic forces in order to create a zone free from all regulations. And I think as Judge Friedland pointed out, access to government information clearly does not qualify as a zone free from all regulations because the government has to have some rules as to how the public and how others can access government data. Licensing agencies such as the Department of Social Services or in the hypothetical that Judge Friedland gave about the California bar need to have some rules as to how the public can access that information. And they don't play a role in the employer-employee relationship at all. And we've argued if plaintiff's theories about the scope of the NLRA were accepted, it would preempt a number of consumer protection laws which would allow the public to access and see, let's say, with respect to the California bar, if their attorney was disbarred or suspended. All of that is useful consumer protection information that the public needs to have access to. We've also pointed to the California Public Records Act, which at least one court has said mandates disclosure of this licensing contact information. I also wanted to turn to Appellant's sort of, I guess, overarching point that allegedly the legislature is putting the thumb on the scales here, which I think plaintiffs pointed to a couple of times in their argument. And I think that's simply a red herring. The scope of the National Labor Relations Act preemption is not dependent on the legislature's intent in enacting state law. That's the Johnson v. Rancho Santiago Community College District. It's at 623 F3rd 1011. And that makes a lot of sense because the scope of the NLRA depends on what Congress intended in enacting federal law, not what the state legislature did or did not or its motivations for enacting a specific law. So that's the real test. And plaintiff's arguments about thumb on the scales and so on and so forth is simply a red herring. For all of those reasons, AB 2455 is not preempted by the National Labor Relations Act. And this court should affirm the district court's grant of summary judgment. Can I just ask, it seems like you spent most of your time on the merits. And I'm wondering if you're really asking us to get rid of this on standing or if it's fine if we just reach the merits in your view at this point? Your Honor, I focus primarily on the merits because Appellant's primarily on the merits as well. We think standing, we would be happy with a ruling on standing grounds. We think they don't meet the requisite standing requirements because they failed to name affected members. They failed to show how the law harms them. So it's that one that I wanted to ask you about if you were pressing it. So it seems like the legislature was trying to unions contact members for purposes of organizing them. And it's a little odd then for the state to say, we don't think that the employers have to worry about unionizing because this won't work or something. I mean, shouldn't we assume that the law will have its intended effect? Your Honor, I'm sorry if I've conveyed that. That's not our point. Our point is simply that if they wanted to demonstrate standing to challenge this law, they needed to show and allege how they were harmed and which of their members were harmed. It's not so much as, you know, they can't demonstrate standing. It's that they didn't. And if you look at excerpts of record 54 through 59, that's their entirety of their allegations on standing. They don't name any affected individuals. They don't go into any detail as to how they were harmed. It's accordingly very similar to the Associated General Contractors case that was cited in our brief, in which this court said plaintiffs didn't have standing to challenge the law, not necessarily because they're not harmed, but because the declarations demonstrating harm were simply insufficient. In that case, there was a similar declaration by the head of a association, just like plaintiffs, and they didn't go into any detail explaining the harm. They didn't go into any detail naming their affected members, and that was what was sufficient. Thank you very much, counsel. We'll now hear from counsel from the union. Thank you, and may it please the court. I'm Scott Cronlund representing the union. The plaintiffs would like it to be harder for unions to make contact with home care aides. They didn't show standing to bring their claim, and they didn't show that the NLRA prevents California from turning over the list. Now, with respect to standing, I want to pick up where the argument left off. For standing purposes, this case is exactly Associated General Contractors v. Caltrans. Exactly. The district court in that case had granted summary judgment to defendant on merits, but this court recognized on appeal that the industry association on summary judgment hadn't presented evidence that identified by name any affected members, and therefore, under Summers, the case was over. The same thing is true here. Judge Freeland asked if there was an exception for situations in which it seems like a lot of the members suffered harm. The exception is only when there's inherent harm, as the Supreme Court explained in Summers, for instance, when you're asking for the organization's membership list, and therefore, all the members are necessarily harmed. Other than that, there's no such exception. This is similar to that, though, other than the opt-out option. Do we have any reason to think that so many people will opt out that it's a significant dent in how much information is given? It's sort of like a disclosure of the information that causes the injury. In fact, what they claim is the injury is a substantial likelihood that the workers will unionize, and that's completely speculative. Most of these employers probably are too small to be the targets of union organizing campaigns. Union may have the information for some employees already. Some may be in geographic areas where there's no organizing. It's just speculation. Do we just assume the legislature was wasting its time? It seems like this law was passed for a reason, and why shouldn't we assume the legislature knew what it was doing and had good reason for it? Again, I'm not asking the court to assume that the legislature wasn't hoping to make it easier, but the law's been in effect since July 2019. At this point, every home care aide's name has already been subject to disclosure if there was no opt-out. I'm not sure there's actually been an increase in unionization, and certainly it would be pure speculation that any of plaintiffs' unidentified members were affected. In summers, the environmental group had 700,000 members, including thousands who used the ad issue in that case. The Supreme Court said probably they have a member withstanding, but they weren't going to excuse the requirement to actually identify the member. Here, it's much more speculative. Had they identified a member, the union might well have been able to show, you know, no, we already know the contact information for your members, or you're not a member. How long after the law went into effect did they file suit? They filed suit very shortly after the law went into effect. So wasn't this about likelihood of harm, not actual harm? I'm not sure how they would have already known the effect of the law so quickly at the time that they filed. Well, they would have had to present facts to show a substantial likelihood of injury in fact. You know, I'm not saying it had to be certain, but after Clapper, it had to certainly be a substantial likelihood. And again, that requires identifying a member who's going to be harmed. Judge Boggs had asked about employees. In addition to them not having standing to represent the analysis. Step one is they have to have an injury in fact of their own before they can try to assert the interests of a third party. The Supreme Court explained that in Hollingsworth v. Perry. They don't have an injury in fact of their own. In the subpoena cases they rely upon, the injury in fact was having to respond to the subpoena. You've asked whether we would prefer a dismissal on standing grounds or dismissal on the merits. I think our preferred situation would be exactly the same thing as in the Associated General Contractors case. The whole that they lack standing, but then point out that they would have lost on the merits. Well, I don't think we can do that. So if we have to choose, what would you choose? I'm not sure we can choose. If there's no standing, that's the end of it. I think so we can't pick and choose, unfortunately. Used to be able to do that in the Ninth Circuit. The Supreme Court and Steel Company kind of stopped us from doing that. I was a law clerk at the court during Steel Company, which is why that case rings in my head all these years later. Any more questions for counsel? All right, seeing no hands, thank you very much counsel for your argument. Mr. Baskin, you've got some time left. Yes, thank you. And let me pick up where folks left off, talking about Summers and hearing about the AGC case. I'm surprised there was no discussion from opposing counsel about the Lorenza case and the California Trucking Association case, which both narrowed the Summers case to its facts, which are unusual facts dealing with the timber industry. And what they said was where it's clear that somebody's harmed. And by the way, you only have to show one person's harm, not the entire association. But where it is clear from the face of the statute that everyone, all employers who are seeking to employ home carriers, and they are harmed by making it easier to organize. That's the harm. It's not you have to wait until you have an election. And as was pointed out, this was a facial challenge filed almost immediately after it was enacted. But let me ask you about the phrase about making it easier if they passed a law that said we're going to make monetary grants to the service employees union and similar unions so that they can organize more. Would that give you standing? Well, that wouldn't have a link to the healthcare associations. I take your point, let's say it was a grant that somehow had a link to the associations. I mean, I take it some of your members somewhere probably are unionized, maybe not many, but you can identify unions that generally are in the home healthcare in the healthcare industry. But the question of simply because you're helping unionization in a general way, how that gives individuals standing. That's why I raised that hypothetical. Right. The issue there would be much more likely a market participation type of issue. They would not be acting as a regulator. If you said that while they're regulating this registry, they're not only handing out the, or let's say instead of handing out the personal information, they are handing out money to the unions. I think they'd have a serious problem as the regulator, because it's different when you are not a market participant and they have the power over the employers and over the employees, and they're abusing that power by getting in with the unions in order to achieve their social policy goal. That is different from the goal of the National Labor Relations Board, as well as Congress. I want to touch on the idea that intent doesn't express. That's contrary to the Gould case. The Wisconsin versus Gould, where the Supreme Court said that intent does matter where it's plain on the face of the statute. Whereas in the Johnson case, they were going around about whether there should be a dividing of the individual views of some legislator. Did that matter? That's a type of legislative determination, legislative history that's been definitely not accepted, but where it is plain on the face of the statute, it's written right into the statement that Section 1, as well as Section 2, that is the whole point. In fact, there is no other point than that. It's just so brazen that they can say that they can be allowed to do that. So the Gould case supersedes Johnson's higher court. Johnson really did not deal with the situation with the statute being clear. They were trying to divide intent, so that's not our situation. The Summers situation is one where it is clear, and because it's clear, the more recent cases since Associated General Contractors, which also, by the way, had some speculation involved in it, we don't have to speculate because it's right there. They're giving them this information, and it's much more like the Aerogram case, which I'll conclude with, which is the one where the unions and the government said, well, we can do this card check thing because the NLRB says that that could be done voluntarily, just like they're claiming that employees could voluntarily hand over their stuff, their contact information, and the court said, no, that's preempted because it's something that cannot be mandated, and that's what the city did try to do in Aerogram. That's what they're trying to do here. It should not be allowed, and they should reverse the district court and find that this thing is preempted. Thank you. Thank you very much, counsel. Thank you all for your arguments today. This matter is submitted, and this panel, actually, this particular panel is adjourned, actually, but I know Judge Boggs and Judge Friedland and I will be appearing later this week. Thank you, everyone, and we will be adjourned.
judges: Boggs, OWENS, FRIEDLAND